# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Joseph Jauhola,

                Plaintiff,

v.

Wisconsin Central, Ltd.,

                Defendant.

Civ. No. 14-1433 (RHK/LIB)
**MEMORANDUM OPINION AND ORDER**

Ashley R. Thronson, Nicholas D. Thompson, Matthew H. Morgan, Nichols Kaster, PLLP, Minneapolis, Minnesota, Russell A. Ingebritson, Ingebritson & Associates, PA, Edina, Minnesota, for Plaintiff.

Holly M. Robbins, William E. Parker, Susan K. Fitzke, Littler Mendelson P.C., Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Joseph Jauhola alleges in this action that Wisconsin Central, Ltd. ("Wisconsin Central") violated the Federal Railroad Safety Act ("FRSA")—specifically, 49 U.S.C. §§ 20109(a) and 20109(b)—by terminating his employment after he reported safety violations. Wisconsin Central now moves for summary judgment, and, for the reasons that follow, its Motion will be granted.

## BACKGROUND

Jauhola started working for the DWP railroad—of which Wisconsin Central is the successor in interest—in 1998. (Thompson Decl., Ex. V, at 10.) He became a machine operator and foreman seven years later. (Id., Ex. U, at 19-20.) In 2010, Jauhola began being supervised by Tony Hardy. (Id., Ex. G.) Jauhola found Hardy's management

skills lacking, and in particular disagreed with his approach to safety. In 2012, Jauhola made numerous statements and complaints about Hardy's safety practices, including the following which he relies upon in his opposing Wisconsin Central's Motion:

First, on June 21, 2012, crews were working to make numerous repairs to the railroad following a flood, and Jauhola complained to Hardy that crews were driving too much and not resting enough. (Id., Ex. U, at 75-77.) Second, on July 21, 2012, Hardy ordered Jauhola to escort a supervisor on company property. Jauhola balked, complaining that doing so would unsafely divert him from helping a coworker on another project, and Hardy yelled at him. (Id., Ex. U, at 84-87.) Third, in July 2012, Jauhola objected when Hardy instructed him to leave a federally mandated safety training. (Id., Ex. U, 88-89.) Fourth, on August 31, 2012, Hardy ordered Jauhola to continue driving a train that was grinding the railroad, but Jauhola refused because the work created sparks that caused grass fires he could not control. (Id., Ex. U, at 90-91.)

At the beginning of September 2012, Jauhola complained to Hardy's supervisor, Daniel Bjork, about Hardy's management style. Jauhola reported that Hardy micromanaged employees, yelled at them, and falsely accused them of not doing their jobs. (Id., Ex. J.) Bjork sent an email summarizing the September 1, 2012, meeting to Chad Anderson, the Chief Engineer; Mark Bauer, the Assistant Chief Engineer; and Duane Spears, a human resources manager. (Parker Decl., Ex. C, at 25; Thompson Decl., Ex. J.)

The next month, on October 4, 2012, in the late afternoon, a crew was working on the tracks. Wisconsin Central kept trains from driving on a track that a crew was

2

working on by assigning "track authority." (Thompson Decl., Ex. U, at 147.) Once "track authority" was released, a train could travel through without delay. One could release track authority by using a computer program that had six steps. First, the user selected the "clear authority" option from the Track Authority menu in the program. Second, the user selected the track for which to clear track authority. Third, the user entered his password. Fourth, the user entered his PIN and clicked "verify." Fifth, the user reviewed a confirmation screen to ensure that everything was answered correctly and affirmatively chose "Release/Report Clear" to continue. Sixth, the user affirmatively selected "yes" in response to the question "Are you sure all employees and equipment are clear of limits and all switches lined for main movement." (Parker Decl., Ex. I, at 154-58.)

That day, Jauhola was responsible for releasing track authority. A train was approaching the area where the crew was working and Jauhola was anxious to clear the track so the train could travel through without delay. (Thompson Decl., Ex. V, at 161.) While the crew was still on the tracks, he completed on his computer the first four of the six steps to release track authority. (Id., Ex. V, at 159-167.) He looked up to see if the crew was off the track yet, and when he looked back at the computer, he saw that the track authority had been released. (Id., Ex. V, at 167-68.) The crew, still on the track, risked being hit by the oncoming train. (Id., Ex. V, at 169.) Jauhola immediately contacted the driver of the train by radio, and the train stopped before anyone was injured. (Id., Ex. V, at 168.)

David Chaney, who had temporarily taken over Bjork's position four days earlier when Bjork went on medical leave, began investigating this "track authority incident" that day. He interviewed Jauhola, who claimed that he did not complete the final two steps to release track authority, but rather the computer released the track authority on its own. (Parker Decl., Ex. D, at 15.) Chaney also contacted IT and asked for someone to examine Jauhola's computer. (Id., Ex. D, at 15.) He emailed Chad Anderson, Mark Bauer, and others, informing them of what had happened. (Thompson Decl., Ex. Q.)

Paul Blankenship, who worked for Midwest Computer Services, Inc., examined Jauhola's computer, from which the track authority had been released. He "found nothing out of the ordinary and [believed] the laptop to be operating within normal parameters." (Parker Decl., Ex. 2, at 162.) Jason Berner, a signals and communications RTC support supervisor at Wisconsin Central, tested the track authority release system by running several test scenarios and analyzed the logs from Jauhola's computer, concluding that the track authority was not released on its own. (Id., Ex. 2, at 166.)

Bjork learned about the track authority incident from Chaney on October 5. He responded to an email from Chaney informing him the incident happened, giving his "discipline assessment" that Jauhola should be "terminate[d] if found guilty," saying Jauhola had "too much history." (Thompson Decl., Ex. P.) Later, after reading a summary of the incident, he reiterated in an email to Chaney, "like I said termination!!" (Id., Ex. Q.) Chaney was the only recipient of those emails; neither Anderson nor Bauer saw them. (Id., Exs. P & Q.; Parker Decl., Ex. D, at 59-60; Parker Decl., Ex. B, at 47.)

4

Chaney did not understand what Bjork meant by "too much history" and did not ask; he did not get along with Bjork or care about his opinion. (Parker Decl., Ex. D, at 60-61.)

Wisconsin Central charged Jauhola with a workplace rule violation and held an investigatory hearing on October 10, 2012. (Thompson Decl., Ex. N.) The hearing officer, Larry Wizauer, summarized the hearing. (Id., Ex. O.) He wrote that an independent contractor found nothing wrong with Jauhola's computer. (Id., Ex. O.) A review of the events log from the computer system reflected that track authority was released from Jauhola's computer and showed nothing suggesting a systems failure. (Id., Ex. O.) Wizauer concluded that Jauhola released the track authority by completing steps five and six and therefore violated the rules by having men and equipment on the track without track authority. (Id., Ex. O.)

After the hearing, Anderson, Bauer, and Chaney talked about the appropriate discipline for Jauhola. (Id., Ex. K, at 54-57.) Bauer recommended termination (Parker Decl., Ex. A, at 25 & 77), and Chaney did not make a recommendation (id., Ex. D, at 13). Ultimately, Anderson approved terminating Jauhola's employment. (Id., Ex. A, at 21.) Based on the investigators' determination that Jauhola's computer and the system did not malfunction, Anderson believed Jauhola manually released the track authority prematurely. (Id., Ex. A, at 26-37.) Anderson thought termination was justified because this was a "cardinal rule violation," a matter of life or death for the crew. (Id., Ex. D, at 26-27.)

Jauhola grieved the decision to fire him to an arbitration board. (Thompson Decl., Ex. S.) The board reviewed the transcript of the investigation hearing and found that

5

even if the alleged violation occurred, termination was too harsh a punishment. (Id., Ex. S.) Specifically, it wrote that "both sides have made relevant points regarding the dangerous nature of the violation and the quick response upon discovery," and the board reinstated Jauhola with backpay for all but forty-five days. (Id., Ex. S.)

Jauhola subsequently filed a complaint with the Occupational Safety and Health Administration (OSHA) on April 17, 2013, alleging he was fired in retaliation for reporting safety violations. (Parker Decl., Ex. I, Ex. 10.) In November 2013, OSHA dismissed the complaint, finding there was no reasonable cause to believe Wisconsin Central violated the FRSA. (Id., Ex. N.) Jauhola then filed this action. Wisconsin Central now moves for summary judgment. The Motion, having been fully briefed and the Court having heard oral argument on July 17, 2015, is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). Wisconsin Central bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to Jauhola. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). Jauhola may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue

6

of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); <u>Wood v. SatCom Mktg., LLC</u>, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

The FRSA is intended to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Jauhola alleges that Wisconsin Central violated two provisions of that law—49 U.S.C. §§ 20109(a) and (b)—by firing him in retaliation for making safety complaints. Section 20109(a) provides, in relevant part, that

> [a] railroad carrier . . . may not discharge . . . an employee if such [discharge] is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done . . .
> (1) to provide information . . . or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security . . . if the information or assistance is provided to . . . a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct . . . [or]
> (2) to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security . . . .

Section 20109(b) provides, in relevant part, that "[a] railroad carrier . . . shall not discharge . . . an employee for reporting, in good faith, a hazardous safety or security condition."

The FRSA incorporates by reference the burden-shifting framework of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121(b)(2)(B). 49 U.S.C. § 20109(d)(2)(A). To prevail on his claim, Jauhola must first make a prima facie showing that protected behavior was a contributing factor in his

7

discharge. 49 U.S.C. § 42121(b)(2)(B)(i). That is, Jauhola must show 1) he engaged in a protected activity, 2) Wisconsin Central knew or suspected, actually or constructively, that he engaged in the protected activity, 3) he suffered an adverse action, and 4) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. Kuduk v. BNSF Ry. Co., 768 F.3d 786, 789 (8th Cir. 2014). If Jauhola successfully states a prima facie case, Wisconsin Central can still avoid liability by showing by clear and convincing evidence that it "would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii); see also Kuduk, 768 F.3d at 789.

   *1. Prima Facie Case*

Jauhola satisfies the third element of his prima facie case because he suffered an adverse action when he was fired. He claims he also satisfies the first element because he engaged in a number of activities protected by 49 U.S.C. § 20109, that is, his complaints of June, July, and August 2013 as described above. Wisconsin Central disputes that any of these actions are protected by the FRSA, but the Court need not decide that question because, even assuming they are covered, Jauhola fails to show that Wisconsin Central knew or suspected, actually or constructively, that he engaged in them. Similarly, Jauhola does not raise an inference that they were a contributing factor in his employment termination.

The relevant question for the second element of Jauhola's prima facie case—knowledge of the protected activity—is whether the *decision-maker* knew about his safety complaints. Kuduk, 768 F.3d at 791 (looking only to whether the decision-maker

8

knew about the protected activity in holding that the railroad lacked knowledge of it).

Here, there is no material dispute of fact that Anderson, who made the decision to fire

Jauhola, and Bauer, who recommended termination, did <u>not</u> know, actually or

constructively, about Jauhola's safety complaints. Anderson did not know that Jauhola

had made safety complaints to Hardy or Bjork, and he never discussed safety complaints

by Jauhola with Bauer, Chaney, or Bjork. (Parker Decl., Ex. A, at 41-42.) Nor did Bauer

know that Jauhola had made safety complaints to Hardy or Bjork.[1] (<u>Id.</u>, Ex. B, at 41.)

Neither of the two pieces of evidence that Jauhola cites create a material dispute

whether Anderson and Bauer knew of his safety complaints. First, Jauhola argues that

Anderson and Bauer knew he made safety complaints because Bjork told them about

Jauhola's September 2012 meeting with Bjork in which he complained about Hardy. (Pl.

Opp'n Mem., at 19.) But there is no evidence that Anderson or Bauer knew that Jauhola

complained to Bjork about any *safety issues*.[2] Bjork's September 1, 2012, email to

Anderson and Bauer detailing his conversation with Jauhola does not mention safety

complaints; rather, it comprehensively details Jauhola's complaints about Hardy's

management style. (<u>Id.</u>, Ex. J.)

---

[1] Jauhola states that Chaney was a decision-maker in his termination (Pl. Opp'n Mem., at 20), but he does not cite any evidence in the record supporting that assertion. While Chaney was present when Jauhola's termination was discussed, that is not enough to make him a decision-maker. Chaney testified that he did *not* recommend Jauhola's termination, and Anderson agreed that Chaney made no disciplinary recommendation. (Parker Decl., Ex. D, at 13; <u>id.</u>, Ex. A, at 25.)

[2] As part of his meeting with Bjork, Jauhola complained to Bjork that Hardy was making him do unsafe track procedures. (Thompson Decl., Ex. U, at 44.)

Specifically, Bjork wrote "Jahoula [sic] called me today complaining about how Tony [Hardy] is pushing him and not let[ting] him focus on his job at hand. Complaining how Tony is micro managing all of their work and not letting them do their jobs." He continued that Jauhola "complained about Tony always hollering at them and making false accusations of them not doing their jobs . . . . Tony is always jumping in and causing them to change plans and the job is taking longer." Bjork also reported that Jauhola "has asked Tony numerous times to sit down and discuss his issues and Tony blows him off" and that Jauhola said that if Bjork "[didn't] do something about Tony and the way he is treating his people he would go over [Bjork's] head and go directly to Chad or HR." Finally, Bjork relayed that Jauhola complained that when he was one minute late for work "Tony jumped all over him and told him that he would be set up for an investigation." (Thompson Decl., Ex. J.) In the Court's view, it is clear that Bjork did not communicate <u>safety</u> complaints to Anderson or Bauer in this email, and therefore this email could not have made them actually or constructively aware of such complaints.

Second, Jauhola argues that two emails Bjork sent to Chaney on October 5, 2012, show that Anderson and Bauer knew he (Jauhola) made safety complaints. In the first email, Bjork recommended terminating Jauhola "if found guilty" because "[Jauhola] has too much history." (<u>Id.</u>, Ex. P.) In the second email, responding to Chaney's summary of the track authority incident, Bjork wrote "[l]ike I said termination!!" (<u>Id.</u>, Ex. Q.) Jauhola argues that a reasonable juror could conclude from these emails that Bjork was referring to Jauhola's "history" of making safety complaints and was recommending that Jauhola be fired because of it.

10

Even if that is what Bjork meant, there is no evidence that any decision-maker knew about this communication. Chaney neither made the decision to terminate Jauhola nor communicated Bjork's messages to Anderson or Bauer. Only Chaney received the emails; he did not forward them, and neither Anderson nor Bauer saw them. (Id., Ex. A, at 83-84; id., Ex. B, at 47.). Moreover, there is no evidence that Chaney understood that to be Bjork's meaning. In fact, Chaney testified he did *not* understand what "too much history" meant, and he did not ask, because he did not care about his Bjork's opinion. (Parker Decl., Ex. D, at 58-60.) In the Court's view, these emails simply provide "no evidence that [Bjork] communicated his knowledge of [Jauhola's] safety concerns to the decision-makers in a manner that might have influenced their discharge decision." Kuduk, 768 F.3d at 791.

Jauhola also fails to satisfy the fourth element of his prima facie case because he cannot show that circumstances raise an inference that his safety complaints were a contributing factor in his employment termination. A "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Id. at 791 (internal citations omitted). It can be proven by direct or circumstantial evidence. DeFrancesco v. Union R.R. Co., ARB Case No. 10-114, ALJ Case No. 2009-FRS-009, 2012 WL 759336, at *3 (Dep't of Labor Feb. 29, 2012). Lacking direct evidence, Jauhola identifies two pieces of circumstantial evidence.

First, Jauhola argues that Bjork's two October 5, 2012 emails to Chaney raise an inference that his safety complaints contributed to the decision to fire him. But they do not, because, as explained above, Chaney neither understood what Kuduk meant by "too

11

much history" nor shared the emails with Anderson or Bauer. In addition, neither Chaney nor Bjork made the decision to terminate Jauhola's employment. There is simply no evidence from which a reasonable factfinder could infer that a decision-maker relied even in part on these emails in making the decision to terminate Jauhola's employment.

Second, Jauhola contends he was treated more harshly than other employees who committed the same offense, which, he says, suggests his safety complaints contributed to his termination.[3] In the Court's view, however, the evidence does not support his contention. Three months before Jauhola's track authority incident, in June 2012, foreman Mitchell Ojard also released track authority with a crew on the tracks, and he was fired. Likewise, in 2010 track supervisor Joshua Orwick released track authority while a crew was on the track. He was fired from his management position, though he retained union rights when he became a manager and exercised them to secure a unionized position after his management position was terminated. (Parker Decl., Ex. A, at 69-72.) Moreover, two other examples of employees being on a track without track authority are not comparable to Jauhola's situation. Hardy went on a track without authority, and Bjork failed to communicate where he was on a track while he was sharing track authority with a coworker; either situation could have caused, but did not cause, a collision. Both Bjork and Hardy were suspended but not fired. But in neither case was the track authority lifted so that the lives of an entire crew were at risk.

---

[3] He also claims he was treated more harshly than the union's collective bargaining agreement allowed, but cites no evidence in support of that statement. (Pl. Opp'n Memo., at 13-15, 21.)

Having failed to make a showing of the second and fourth elements, Jauhola fails to make out a prima facie case under the FRSA.

   *2. Clear and Convincing Evidence*

Even if Jauhola had stated a prima facie case, his claim would still fail because Wisconsin Central has shown by clear and convincing evidence that it would have dismissed him absent safety complaints because he released track authority with a crew on the tracks. Anderson decided to terminate Jauhola. (Parker Decl., Ex. A, at 21.) In doing so, he relied on Bauer's recommendation. (Id., Ex. A, at 25 & 77). He also considered the investigative report put together after the October 10 hearing. (Id., Ex. A, at 26.) The report detailed the investigation into potential problems with Jauhola's computer; the investigators concluded the system was operating properly and the computer had not spontaneously caused the track authority to be lifted. (Thompson Decl., Ex. O.) There is no evidence that the investigation into the computer was intentionally poorly conducted or that there was any reason for Anderson or Bauer to doubt its conclusion at the time. From this evidence, Anderson determined that Jauhola had released the track authority. He decided to terminate Jauhola's employment because Jauhola violated a "cardinal rule" of not putting lives in danger by releasing the track authority while the crew was still on the track. (Parker Decl., Ex. D., 26-27.)

Jauhola's arguments to the contrary fail. First, he claims, relying on his purported expert, that the investigation of his computer following the incident was "grossly incompetent." (Pl. Opp'n Mem., at 24.) But even if the investigation had been conducted poorly, he does not point to evidence that it was done in bad faith. See

Roberts v. USCC Payroll Corp., 635 F. Supp. 2d 948, 968 (N.D. Iowa 2009) (explaining, in an ADEA case, that "[e]vidence of a poorly conducted investigation, standing alone, absent evidence that defendants acted in bad faith, failed to follow their ordinary disciplinary procedures or treated other employees differently . . . cannot show pretext or defeat a summary judgment motion"). Nor does he identify evidence that Anderson or Bauer relied on the investigation's results in bad faith. The relevant question is "not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred," and the evidence shows that Anderson believed that Jauhola improperly released the track authority. Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 842 (8th Cir. 2008) (discussing pretext for retaliation in a Title VII case). Moreover, to the extent Jauhola is arguing the quality of the investigation raises questions about whether Jauhola actually committed a rule violation, Kuduk's logic applies. Responding to the plaintiff's argument that there were "serious questions" as to whether plaintiff committed the alleged rule violations, the court there explained that "federal courts do not sit as a super-personnel department that re-examines an employer's disciplinary decisions. In the absence of evidence connecting his protected activity to the discharge, [plaintiff] is not entitled to FRSA anti-retaliation relief even if [defendant] inaccurately concluded that he [violated the rules]." Kuduk, 768 F. 3d at 792.

Second, Jauhola suggests that the fact that an investigative hearing was held does *not* support Wisconsin Central's argument that Jauhola was dismissed for releasing track authority. Specifically, he points to the fact that an arbitration board found discharge was inappropriate. (Thompson Decl., Ex. S.) But Jauhola does not explain how the

14

*arbitration board's* decision to modify his discipline creates a material dispute of fact that *Anderson's* decision to terminate his employment was made for reasons unrelated to safety complaints. The arbitration board never disputed the facts as found in the investigation, and in fact agreed that the violation was of a dangerous nature and serious discipline was warranted. It simply disagreed with the severity of the discipline, pointing to Jauhola's quick response upon discovering track authority was lifted. (Id., Ex. S.)

Jauhola's final two points are equally unavailing. He contends the decision-makers were not disinterested, because they knew that Jauhola objected to Hardy placing productivity ahead of safety, and they cared about productivity for their income. But as explained, there is no evidence Anderson or Bauer knew that Jauhola had complained about Hardy's safety practices. Jauhola also argues that Wisconsin Central did not consistently enforce its policies, sometimes firing people who violated track authority rules, and sometimes not. But as explained above, in the Court's view, the railroad similarly treated all three employees who released track authority with a crew on the track—it fired them.

For these reasons, the Court will grant summary judgment to Wisconsin Central.[4]

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Wisconsin Central's Motion for Summary Judgment (Doc. No. 83) is **GRANTED**; Wisconsin Central's Motion to Exclude Expert Testimony (Doc. No. 86) is

---

[4] Wisconsin Central also filed a Motion to exclude Jauhola's expert witness (Doc. No. 86). In light of the Court's ruling, that Motion will be denied as moot.

**DENIED AS MOOT**; and the Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: August 20, 2015

s/Richard H. Kyle<br>RICHARD H. KYLE<br>United States District Judge